**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Rutilio GARCIA–SANCHEZ, a.k.a. Jose, Defendant–Appellant.**

**No. 97–30157.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1999.

Decided Sept. 3, 1999.

Lana C. Glenn, Spokane, Washington, for the defendant-appellant.

Timothy J. Ohms, Assistant United States Attorney, Spokane, Washington, for the plaintiff-appellee.

1. Honorable Thomas M. Reavley, Senior Circuit Judge for the Fifth Circuit, sitting by

Before: GOODWIN, REAVLEY,[1] and McKEOWN, Circuit Judges.

GOODWIN, Circuit Judge:

Garcia–Sanchez was convicted of conspiracy to distribute more than five kilograms of cocaine in violation of 21 U.S.C. § 846 and sentenced to 121 months in prison. He challenges both his conviction and sentence. We affirm the conviction but reverse and remand the sentence. The district court did not determine the scope of Garcia–Sanchez' involvement in the conspiracy before attributing to him all the conspiracy's sales. Moreover, the estimate of the amount of drugs sold by the conspiracy was not supported by reliable evidence.

## I. Factual & Procedural Background

### A. Evidence At Trial

Garcia–Sanchez was arrested as part of an investigation into a retail cocaine and heroin sales operation based in the trailer of Lawrence Bertolino. The leader of the conspiracy was Cipriano Zavala. The government introduced substantial evidence of the conspiracy and of Zavala's involvement. Zavala fled during trial and was convicted *in absentia.*

The evidence incriminating Garcia–Sanchez was largely limited to the testimony of Bertolino and another cooperating witness, Colleen Fowler. Bertolino testified that Zavala began living with him and selling cocaine and heroin out of his trailer in early 1994 or 1995. Bertolino, a heroin addict, allowed Zavala to use his residence in exchange for free heroin. According to Bertolino, after about six months Zavala began staffing the operation with "employees," including Garcia–Sanchez (known as Jose), Roy, and Manuel. Each of them would live in the trailer and sell drugs in shifts lasting a "couple of weeks." Zavala would regularly visit to supply the opera-

designation.

tion with drugs and to collect the proceeds. Bertolino reported that by the time the authorities arrested the conspirators, in September 1996, Garcia–Sanchez had become Zavala's "right-hand man" managing the entire operation when Zavala was otherwise occupied. Fowler testified that she purchased drugs from Garcia–Sanchez "day in and day out" for a period in spring 1995. The government's only other direct evidence of Garcia–Sanchez' involvement was Zavala's frequent use in drug transactions of a pager registered to Garcia–Sanchez.

## B. Sentencing

The Presentence Investigation Report (PSI) assumed that because Garcia–Sanchez was convicted under an indictment charging 5kg of cocaine sales, it should follow that he must be sentenced for selling 5kg of cocaine. Defense counsel filed no objections to the PSI, but, at the sentencing hearing, he did object when the government urged the court to accept the PSI's reasoning and sentence Garcia–Sanchez to the 10 year mandatory minimum specified by 21 U.S.C. § 841(b)(1)(A) for selling 5kg of cocaine. The district court correctly refused to rely on the indictment and instead undertook independently to determine the quantity of drugs for which Garcia–Sanchez should be held responsible. See United States v. Castaneda, 9 F.3d 761, 769–70 (9th Cir.1993) (reversing sentence where district court failed to look beyond amount mentioned in indictment and make an individualized determination of the quantity of drugs involved).

The district court first concluded that Garcia–Sanchez had been a member of the conspiracy for at least 15 months. The court then calculated the conspiracy's probable weekly sales during this period. On this point, the government presented the testimony of a single case agent. The agent gave an estimate supposedly based on his out-of-court conversations with Bertolino. The contents of the agent's conversations with Bertolino are not in the record, but apparently formed the basis for the agent's opinion of the volume of business done by the conspiracy. The government introduced no other evidence of the conspiracy's sales. The defense at this point did not present any evidence, nor even cross-examine the agent. The court adopted the low-end of the agent's sales estimate, one ounce of heroin and two ounces of cocaine weekly. Assuming the number of ounces and the number of weeks Garcia–Sanchez had been involved in the conspiracy, the court then concluded that the conspiracy had sold the sentencing equivalent of over 2500kg of marijuana during the 15 months of his involvement.[2] The district court chose to hold Garcia–Sanchez accountable for all of these sales and assigned him a corresponding USSG offense level of 32. With a criminal history category of I, Garcia–Sanchez' Guidelines range was 121–151 months. The district court sentenced Garcia–Sanchez to 121 months imprisonment.

## II. Challenges to the Conviction

Sanchez first argues that the government did not introduce sufficient evidence to support the conviction. We must decide if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The evidence at trial, though not overwhelming, was clearly sufficient to sustain Garcia–Sanchez' conviction. Substantial evidence was introduced

2. The court's factual findings imply total sales of 3.6kg of cocaine (2 oz. cocaine/week, or 56g, × 64 weeks) and 1.8kg of heroin (1 oz. heroin/week, or 28g, × 64 weeks). For sentencing purposes, a kilogram of cocaine is equivalent to 200kg of marijuana and a kilogram of heroin to 1000kg of marijuana. See USSG § 2D1.1 comment. (n.10) (Drug Equivalency Tables). The conspiracy's sales were thus the equivalent of over 2500kg of marijuana. A base offense level of 32 is specified for sales of 1000–3000kg of marijuana. See USSG § 2D1.1(c)(4).

of a retail and wholesale drug outlet based in Bertolino's trailer. Bertolino testified that Garcia–Sanchez (known to him as "Jose") spent weeks at a time living in the trailer selling drugs on behalf of co-defendant Zavala. Bertolino also testified that Garcia–Sanchez eventually became

> a big wig.... Cipriano's [Zavala] partner. He was his right-hand man, you might call it. Cipriano was busy or something ... he would let his partner Jose run the show. Jose would do the same thing, bring up the dope, get the money and go back home.

Fowler also testified to Garcia–Sanchez' involvement in the conspiracy. The corroborated, unequivocal, uncontroverted, first-hand testimony of Bertolino, a key actor in the conspiracy, is sufficient to support Garcia–Sanchez' conviction.

■■ Garcia–Sanchez next claims the testimony of cooperating government witnesses should have been suppressed because the government's grant of leniency in exchange for their testimony violated 18 U.S.C. § 201(c)(2) (prohibiting "directly or indirectly, giv[ing], offer[ing] or promis[ing] anything of value to any person, for or because of the testimony under oath"). This is the controversial interpretation of § 201(c)(2) accepted by a panel of the Tenth Circuit last year but rejected by the en banc court. *See United States v. Singleton,* 144 F.3d 1343 (1998), *rev'd en banc,* 165 F.3d 1297 (10th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). The issue was not raised before the trial court, so the plain error standard applies. Though the Ninth Circuit has not yet addressed *Singleton* on the merits, this Court has held any such error "was not plain under the law of this (or any other) circuit." *United States v. Flores,* 172 F.3d 695, 699–700 (9th Cir.1999), *petition for cert. filed* (June 28, 1999) (No. 99–5111).

### III. The Amount of Drugs Attributable to Garcia–Sanchez' Conduct

Garcia–Sanchez' sentence was largely determined by the amount of drugs the district court attributed to his conduct. The district court decided first to hold Garcia–Sanchez responsible for all of the drugs sold by the conspiracy during the period of his involvement. The district court then estimated the amount of drugs sold by the conspiracy during that time. The district court's estimate was itself the result of two approximations-the length of Garcia–Sanchez' involvement in the conspiracy and the conspiracy's weekly sales.

The length of Garcia–Sanchez' participation, 15 months, was established by the trial testimony of two percipient witnesses, Bertolino and Fowler, and is not seriously disputed. Two substantial questions, however, are raised by the sentencing hearing: (1) Is this defendant, for sentencing purposes, responsible for all the drugs sold by the conspiracy during his association with it? (2) Did the sentencing court have before it reliable evidence upon which to determine the probable amount of contraband sales attributable to the defendant?

*A. Garcia–Sanchez' Accountability for the Conspiracy's Total Sales*

■■ The district court failed to determine the scope of Garcia–Sanchez' agreement with his co-conspirators before sentencing him on the basis of all the conspiracy's sales during the period of his participation. Unlike criminal liability for the acts of co-conspirators, a defendant is not always accountable under the Sentencing Guidelines for all the acts of his co-conspirators. *See* USSG § 1B1.3 comment (n.1). "[T]he sentencing court may not rely simply upon the total amount involved in the drug conspiracy, but must undertake an individualized evaluation of the amount for which [the defendant] is accountable under the Guidelines." *United States v. Newland,* 116 F.3d 400, 405 (9th Cir.1997). *See also United States v. Petty,* 992 F.2d 887, 890 (9th Cir.1993) ("Under the Guidelines each conspirator ... is to be judged not on the distribution made by the entire conspiracy but on the basis of the quantity of drugs which he reasonably foresaw or which fell within

'the scope' of his particular agreement with the conspirators.").

The government's witnesses testified that, at least at the beginning, Garcia–Sanchez was one of at least three "employees" who sold drugs for Zavala at Bertolino's apartment in two-week shifts. If Garcia–Sanchez' only agreement was to periodically staff the operation for Zavala and if he had no interest in, agreement regarding, or involvement with the sales of the others, then the district court erred in sentencing Garcia–Sanchez for the sales of other conspiracy members. In order to attribute all the conspiracy's sales to Garcia–Sanchez, the district court must first conclude that he entered into an agreement with Zavala and his peers to collectively sell drugs at Bertolino's residence. Garcia–Sanchez' agreement had to concern all the sales at the trailer, not just his own.

The Sentencing Commission provides an analogous illustration. A street-level dealer who shares a supplier with other dealers and knows of the other dealers' sales but operates independently is only accountable for his own sales. But if the street-level dealer "pools his resources and profits" with the other sellers, he is accountable for all the drug sales. *See* USSG § 1B1.3 comment. (n.2(c)(6)). While it is possible all the conspirators shared responsibility for and profits from all the operation's sales, it is also possible Garcia–Sanchez was the equivalent of an independent street-level dealer, with his territory circumscribed in time rather than space. There was, of course, evidence that Garcia–Sanchez eventually rose to become Zavala's lieutenant, managing the entire operation. The district court may need to determine when the scope of Garcia–Sanchez' agreement changed.

■■ Because trial counsel did not object to the district court's holding Garcia–Sanchez accountable for all of the conspiracy's sales, the plain error standard applies. *See United States v. Randall,* 162 F.3d 557, 561 (9th Cir.1998), *cert. denied,* — U.S. —, 119 S.Ct. 1480, 143 L.Ed.2d 563 (1999). The sentence will be reversed only if the error (1) was "clear or obvious", (2) affected substantial rights, and (3) seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *See id.* Because the Sentencing Guidelines' approach to conspiracy liability is clear and well established, the error was plain. If the district court were to conclude that for much of the 15 months the scope of Garcia–Sanchez' agreement was limited to his own sales, then the drug quantity attributable to Garcia–Sanchez would probably drop enough to lower his offense level and sentencing range. His substantial rights may have been affected and the fairness of his sentence is in question.

*B. The Evidence of the Conspiracy's Sales*

■ The district court's estimate of the conspiracy's weekly sales was not based on reliable evidence. Facts used in sentencing usually need to be established only by a preponderance of the evidence. *See United States v. Restrepo,* 946 F.2d 654, 656–59 (9th Cir.1991) (en banc). We show great deference to trial court factual determinations, reviewing only for clear error. *See United States v. Asagba,* 77 F.3d 324, 326 (9th Cir.1996) ("[T]he clearly erroneous standard is significantly deferential, requiring for reversal a definite and firm conviction that a mistake has been made."). We insist, however, that in establishing the facts, including approximations, underlying a sentence, the district court utilize only evidence that possesses " 'sufficient indicia of reliability to support its probable accuracy.' " *United States v. August,* 86 F.3d 151, 154 (9th Cir.1996) (*quoting* USSG § 6A1.3(a)).

The district court's estimate of the conspiracy's weekly sales is supported only by unexplained conclusions drawn from unrevealed out-of-court statements. The evidence presented by the government on this issue was limited to the following statement by a case agent at the sentenc-

ing hearing: "[a]s a result of interviewing Lawrence Bertolino, who is the principal middle person here in Spokane for Cipriano, [i.e.] Zavala[,] and Rutilio Garcia[-Sanchez]'s distribution of cocaine and heroin, we determined that cocaine was being sold anywhere from two to three ounces a week from the Bertolino residence. In addition to one to two ounces of heroin." There is no other reference to the conspiracy's weekly sales at the sentencing hearing or at trial.

It was error for the court to have relied solely on this conclusory testimony. The district court can certainly rely on a government estimate, but the court has the same obligation to ensure "the information underlying the estimate" possesses " 'sufficient indicia of reliability to support its probable accuracy.' " *United States v. Ortiz,* 993 F.2d 204, 207 (10th Cir.1993) *quoting* USSG § 6A1.3(a). On the present record, neither the district court nor this court can determine whether the agent's estimates were reliable or based on reliable information. The agent had no firsthand knowledge of the conspiracy's sales. He did not explain how he arrived at his estimates. He did not reveal the hearsay upon which he relied. He did not produce the contemporaneous FBI 302 reports of his interviews with Bertolino. He was not cross-examined. His opinion was not tested or challenged.

■■■ The court should have required the government to disclose the information supporting the estimates and justify its reliability. Normally, in our adversarial system, this task is the responsibility of the parties. The government is obliged to present sufficient reliable evidence to support its sentencing recommendations, and defense counsel is obliged to confront the government's evidence. The district court's role was admittedly difficult given the parties' failure to carry out their respective duties. The district court had, nonetheless, an independent obligation to

ensure that the sentence was supported by sufficient reliable evidence. *See United States v. Wilson,* 900 F.2d 1350, 1354 (9th Cir.1990) (recognizing "a defendant's due process right to ensure the reliability of information used at sentencing").

■■ Bertolino's statements, the information underlying the approximation, should have been introduced, ideally through Bertolino's testimony at trial or sentencing, so the evidence could be tested and challenged by defense counsel and so his credibility could be evaluated by the district judge. Because the Confrontation Clause does not apply at sentencing, however, the government had the option of introducing Bertolino's out-of-court statements. *See United States v. Petty,* 982 F.2d 1365, 1369 (9th Cir.1993). But "Due Process requires that some minimal indicia of reliability accompany a hearsay statement," even at sentencing. *Id.* The district court could not use Bertolino's out-of-court statements to the agent unless they are reliable, i.e., unless they are corroborated or have some other minimal indicia of reliability. *See, e.g., United States v. Huckins,* 53 F.3d 276, 279 (9th Cir.1995) (uncorroborated "post-arrest hearsay statements of an accomplice" made in the context of plea negotiations where he "may very well have been hoping to curry favor with law enforcement officials by implicating his accomplice" too unreliable to use at sentencing); *Ortiz,* 993 F.2d at 207 (uncorroborated hearsay statement by confidential informant regarding defendant's weekly drug sales not reliable for use at sentencing).

The government contends the error is harmless because Bertolino testified at trial that in exchange for the use of his residence the conspiracy provided him with 14 grams of heroin weekly for his personal use. Over the 15 months, this heroin distribution alone is the equivalent of 896kg of marijuana, easily justifying Garcia–Sanchez' offense level of 32.[3] We

---

**3.** A base offense level of 32 is specified for the sales equivalent of 1000–3000kg of marijuana. *See* USSG § 2D1.1(c)(4). Presumably any retail cocaine and heroin drug operation would easily sell more than the equivalent of 104kg of marijuana over 15 months.

are unable to accept the government's argument for two reasons. First, if Garcia–Sanchez is only responsible for a portion of the conspiracy's total sales, see Part A *supra*, then the 896kg figure still may not support an offense level of 32. Second, the government confuses our review of the factual basis for a sentence with our review of the sufficiency of the evidence underlying a conviction. In a sufficiency of the evidence review, we might rely on just such an isolated statement in the record to support a jury's decision. In the sentencing context, however, our review is limited to the factual conclusions already reached by the district court. We should not usurp the trial court's function by drawing our own factual conclusions from isolated, unexamined statements in the record. It is particularly the province of the district court to evaluate testimony and make the factual findings necessary to establish an appropriate sentence. The error was not harmless.

## IV. Other Sentencing Challenges

We disagree with Garcia–Sanchez' other challenges to his sentence. He argues the trial court should have departed downward for his minor or minimal role in the conspiracy. The trial court's determination of the extent of Garcia–Sanchez' involvement in the conspiracy is a factual issue reviewed for clear error. *See United States v. Felix*, 87 F.3d 1057, 1061 (9th Cir.1996). Bertolino testified that Garcia–Sanchez had an average role at the beginning and eventually had a very important role in the enterprise. There was evidence that by the end Garcia–Sanchez was the ring-leader's "right hand man". On this record, the district court did not clearly err in concluding Garcia–Sanchez was not a minor or minimal participant.

Garcia–Sanchez also contends that the district court erred in not considering him for the safety valve provision, 18 U.S.C. § 3553(f). Garcia–Sanchez is ineligible for the safety valve provision because he did not "tell all you can tell," i.e., make a good-faith effort to "provide (prior to sentencing) all information at his disposal relevant to the offense, whether or not it is useful to the Government." *United States v. Sherpa*, 110 F.3d 656, 659–60 (9th Cir. 1997); *see also* § 3553(f)(5). He never even met with the government to offer information. Garcia–Sanchez' trial counsel conceded as much at the sentencing hearing. To the extent he claims he did not meet with the government because he is innocent and had no relevant information, we cannot agree. Given his undisputed association with members of the conspiracy, he would have some, perhaps useless, relevant information to provide the government even if he were innocent of drug dealing himself.

Garcia–Sanchez finally claims he was denied effective representation at sentencing because his trial counsel failed to (1) review the PSI with him and file objections to it and (2) properly explain the safety valve provision to him.[4] A review of the sentencing transcript reveals trial counsel's clearly lackluster performance.[5] Because the record, however, is inadequate to properly evaluate whether the perfor-

---

4. At sentencing, trial counsel stated, "Well as a footnote, Your Honor, I explained the Safety Valve criteria to Mr. Garcia–Sanchez and, of course, that wouldn't apply because he's maintaining his innocence in this case." If defense counsel advised Garcia–Sanchez that he could not qualify for the safety-valve provision unless he admitted his guilt, that is an erroneous interpretation of the law that may have prejudiced Garcia–Sanchez. *See United States v. Sherpa*, 110 F.3d 656, 660 (9th Cir. 1997) (defendant who maintains innocence can receive benefit of safety valve provision if trial judge determines he otherwise qualifies).

5. As detailed above, at sentencing counsel declined to cross-examine the government agent's key testimony regarding the conspiracy's drug sales; did not object to the agent's reliance on hearsay; and failed to argue that Garcia–Sanchez should not be held accountable for the drugs sold by Manuel and Roy. He also seemed to concede drug quantity issues believing cocaine and heroin sales could not be combined to determine whether the mandatory minimum applied.

mance was inadequate and prejudicial, the issue is left for collateral review. *See United States v. Robinson,* 967 F.2d 287, 290 (9th Cir.1992) (claims of ineffective counsel reviewed on direct appeal only where record is complete and counsel's representation is obviously inadequate).

### V. Conclusion

The conviction is affirmed. The sentence is reversed and remanded to allow the trial court to determine the scope of Garcia–Sanchez' agreement with his co-conspirators for purposes of sentencing and to estimate the relevant drugs sales using reliable evidence. Any ineffective assistance of counsel claims should be raised on collateral review.

AFFIRMED in part and REVERSED and REMANDED in part.